IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                        No. CR 08-1539-MV

FELIPE CANELA and MANUEL ORTIZ,

        Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motions for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29. Both defendants moved for judgment of acquittal at the close of the Government's case and subsequently renewed their motions at the end of trial. Defendants also submitted written motions for judgment of acquittal. Mr. Canela filed his motion on May 26, 2009 [Doc. 125] and Mr. Ortiz filed his motion on May 28, 2009 [Doc. 132]. The Court, having carefully considered Defendants' motions, the briefs, relevant law and being otherwise fully informed, finds that Defendant Felipe Canela's Motion is well-taken and will be **GRANTED**. The Court further that Defendant Manuel Ortiz's Motion will be **DENIED** with respect to Counts 2 and 3 of the Indictment, and **GRANTED** with respect to Count 1 of the Indictment.

### BACKGROUND

**I.     Facts**

Defendants Manuel Ortiz and Felipe Canela are both independent commercial truck drivers. Mr. Ortiz owns a business called Ortiz and Sons Trucking. On June 16, 2008, they began a cross-country trip in Mr. Ortiz's tractor-trailer in which they were to deliver a load of frozen vegetables from the Apio produce facility in Guadalupe, California to Pittsgrove, New

Jersey.[1]  Defendants departed Guadalupe in the early morning hours of June 17, 2008 and made

two short stops later that morning in Palm Springs, California and Ehrenberg, Arizona.  That

afternoon, they stopped in Phoenix, Arizona, where they stayed for roughly nineteen hours.

They  arrived at the Gallup, New Mexico Port of Entry the afternoon of June 18, 2008.

At the Port of Entry, Defendants provided various records of their trip that the port

inspectors found to be suspicious.  Their hours were incorrectly logged and Defendant Felipe

Canela's commercial driver's license was invalid.  When their suspicions arose, two officers

inspected Defendants' trailer and discovered two bags containing substances they believed to be

illegal narcotics.  One of the bags was a large, red, glossy, paper bag with images of balloons on

it.  The second bag was a large black duffel bag.  Subsequent tests revealed that the substances in

the bags were cocaine and MDMA, which is also known as ecstacy.

## II.    Procedural History

On July 8, 2008, Mr. Ortiz and Mr. Canela were charged in a three-count Indictment with

Conspiracy to Possess with Intent to Distribute 5 Kilograms and More of Cocaine and 3, 4-

Methylene-Dioxymethamphetamine (MDMA) in violation of 21 U.S.C. § 846, Possession with

Intent to Distribute 5 Kilograms and More of Cocaine in violation of 21 U.S.C. §§ 841 (a)(1) and

841(b)(1)(A) and Aiding and Abetting in violation of 18 U.S.C. § 2, and Possession with Intent

to Distribute 3, 4-Methylene-Dioxymethamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(C) and Aiding and Abetting in violation of 18 U.S.C. § 2.

Trial commenced on May 18, 2009 and the jury returned a verdict of guilty as to both

---

[1]At some point after the beginning of Defendants' trip, the final destination was changed
from Pittsgrove to Reading, Pennsylvania.

Defendants on all three counts of the Indictment on May 21, 2009.  At the close of the
Government's case-in-chief, Defendants moved for judgment of acquittal pursuant to Fed. R.
Crim. P. 29(b) and the Court deferred ruling on the motions.  At the close of all evidence,
Defendants renewed their motions for judgment of acquittal pursuant to Fed. R. Crim. P. 29(b)
and also moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a).  In their motions,
Defendants do not dispute that the substances located in their truck were in fact distributable
quantities of cocaine and ecstacy.  However, they argue that the government failed to prove that
they had any knowledge of the narcotics' presence.

<b>STANDARD OF REVIEW</b>

**I.      Motion for Judgment of Acquittal**

A conviction can constitutionally stand only if, after viewing the evidence in the light
most favorable to the prosecution, a rational trier-of-fact could have found the essential elements
of the crime charged beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).
To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do
more than raise a mere suspicion of guilt.  *United States v. Troutman*, 814 F.2d 1428, 1455 (10th
Cir. 1987) (citations omitted).  However, it need not conclusively exclude every other reasonable
hypothesis and it need not negate all possibilities except guilt.  *United States v. Vallejos*, 421
F.3d 1119, 1122 (10th Cir. 2005) (citations omitted).

In examining the evidence, courts must consider the "collective inferences to be drawn
from the evidence as a whole." *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997)
(quotation omitted).  While the jury may draw reasonable inferences from direct or
circumstantial evidence, an inference must be more than speculation and conjecture to be

reasonable, and "caution must be taken that the conviction not be obtained by piling inference on inference." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995) (quotations omitted). "A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 (10th Cir. 1987) (quotation omitted).

Under the Federal Rules of Criminal Procedure, if the court reserves decision on a motion for judgment of acquittal at the close of the government's case-in-chief, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). However, pursuant to *United States v. Vallo*, 238 F.3d 1242, 1248 (10th Cir. 2001), "when a defendant testifies on his own behalf, the court may consider the entire record in ruling on a renewed motion for acquittal at the close of all the evidence." Because Defendant Felipe Canela testified on his own behalf and renewed his motion for judgment of acquittal at the close of all the evidence, the Court considers the entirety of the evidence presented at trial when ruling on his motion. In ruling on Defendant Manuel Ortiz's motion and renewed motion, the Court considers only the evidence presented during the government's case-in-chief.

## II.     The Instant Offenses

Defendants sustained convictions for conspiracy to possess with intent to distribute cocaine and ecstacy and for possession with intent to distribute cocaine and ecstasy and aiding and abetting. To support a conspiracy conviction, "the government must show that there was an agreement to violate the law, that the defendant knew the essential objectives of the conspiracy, that the defendant knowingly and voluntarily took part in the conspiracy, and that the conspirators were interdependent." *Jones*, 44 F.3d at 864-65, citing *United States v. Anderson*,

981 F.2d 1560, 1563 (10th Cir. 1992).  A drug conspiracy conviction can only stand if the evidence, when viewed in the light most favorable to the prosecution, demonstrates that at least two people "intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged."  *United States v. Caldwell*, __ F.3d __, 2009 WL 5103110, at * 4 (10th Cir. Dec. 29, 2009) (citing *United States v. Evans*, 970 F.2d 663, 670-71 (10th Cir. 1992)) (italics in original).

In order to convict a defendant of possession of a controlled substance with intent to distribute, the government must prove beyond a reasonable doubt that the defendant knowingly possessed the controlled substance with the specific intent to distribute.  *United States v. Hager*, 969 F.2d 883, 888 (10th Cir. 1992).  A defendant can also be implicated by aiding and abetting a co-defendant in the possession of narcotics with intent to distribute.  18 U.S.C. § 2.  To be guilty of aiding and abetting, a defendant must willfully associate with the criminal venture and aid such venture through affirmative action.  *United States v. Esparsen*, 930 F.2d 1461, 1470 (10th Cir. 1991).  The government must prove, through direct or circumstantial evidence, more than mere presence at the scene of the crime even if coupled with knowledge that the crime is being committed.  *Id*.  While evidence of "relatively slight moment may warrant a jury's finding of participation,"  *United States v. Zamora*, 784 F.2d 1025, 1031 (10th Cir. 1986), a defendant "may not stumble into aiding and abetting liability by inadvertently helping another in a criminal scheme unknown to the defendant."  *United States v. Hanson*,  41 F.3d 580, 582 (10th Cir. 1994).

## EVIDENCE PRESENTED AT TRIAL

I.     **Evidence Presented During the Government's Case-in-Chief**

    A.     **Testimony of Bela Suich**

Bela Suitch is a supervisor at CH Robinson, which is a large freight management company that handles freight from major produce-growing regions. CH Robinson's customers can be either shippers or receivers. The company receives orders for shipments, assigns the orders to an appropriate carrier, and manages the freight while in transit.

Mr. Suitch testified that in June of 2008, CH Robinson assigned an order for frozen vegetables to a contractor who in turn contracted with Defendant Manuel Ortiz, to transport the shipment of vegetables from the Apio facility in Guadalupe, California, to Pittsgrove, New Jersey. Apio, the customer and shipper of the produce in this case, is a large company that produces and manufactures western vegetables and ships the manufactured product to its various customers throughout the United States.

According to Mr. Suich, it was necessary to maintain the truck at a proper temperature to prevent the fresh produce from breaking down. For this reason, the customer required that team service be utilized. Mr. Suich explained that team service, comprising of two drivers in the cab, allows a load to be delivered faster because one driver can drive the truck while the other driver takes mandated rest breaks. Mr. Suich indicated that where, as here, the service between California and the east coast was expedited and especially in light of the outside temperature, a driver would not be expected to spend twenty-four hours in Arizona.

Mr. Suich further testified that Apio, the shipper, required the use of a data recorder. He explained that this device records the temperature in the trailer where the product is stored, and

advises the receiver of the product as to whether the driver of the trailer maintained proper temperatures during transit.  Mr. Such also testified that while the shipper required use of proper load locks inside the trailer, it did not require the use of a seal or padlock to secure the outside of the trailer.

       **B.**     **Testimony of Doug Larose**

Doug Larose is a general manager for Moody Western Cooling, a company that provides labor for Apio at its facility in Guadalupe, California.  Mr. Larose has worked at the Apio facility since October of 1997 and is familiar with the company's production methods, procedures for preparing pallets for shipping, and loading requirements.  Mr. Larose testified as to the system in place at Apio in 2008 for tracking produce from the time it is harvested to the time it is shipped and subsequently delivered to the customer.  He also testified as to Apio's strict security measures, including prohibiting strangers in the facility, prohibiting foreign materials in close proximity to the fresh produce, and the use of security gates and doors.  Mr. Larose testified that anyone who sees anything foreign in the facility is encouraged to report it.

Mr. Larose described the process in the pre-stage area, which he emphatically stated is a secure area.  In this area, employees build orders and stack the produce onto pallets.  Once the pallets are completed, they are then taken from the pre-stage area to the loading area where they are loaded on to the truck.  During this process, Apio requires the driver to be on the loading dock so that he may observe the loading process, verify the carton counts, and check to see if the product is damaged.

After the pallets have been loaded, the driver is responsible for installing the load locks – metal bars which are used to secure the load while in transit.  The driver is the last person to

touch the load.  Before leaving the facility, he signs a record of the items loaded on his truck at

the pre-stage area, certifying that the record is correct and the load is ready for transport.  The

loader then takes this record to the dispatch office and the dispatcher prints up a bill of lading,

which is a record the driver is required to keep of what he is transporting.  According to Mr.

Larose, once the truck leaves the facility, the driver is responsible for the load.

### C.    Testimony of Pedro Flores

Pedro Flores, an Apio employee of five years, testified as to the loading process of Mr.

Ortiz's truck.  He first explained the loading process in general terms.  As each trucker checks in,

the dispatcher and loader place the order on pallets and then load the pallets in the designated

truck.  According to Mr. Flores, truck drivers normally stay by the truck doors observing the

loading process.  Once Mr. Flores is finished loading, he obtains the driver's signature and the

driver then places the load locks on the load.

With regard to this particular load, Mr. Flores stated that he did not see a red bag or a

black duffle bag when he loaded the truck, and he denied loading these items onto the truck.  He

also testified that if he had seen the bags, he would have reported them to the supervisor because

no one is permitted to bring anything into the cooler area, other than a plastic water bottle.  He

also testified that when he loads the pallets, he always makes sure that the straps around the

pallets are secure.  He further testified that he is responsible for placing the temperature recorder

on the last pallet.  According to Mr. Flores, the pallets are stacked in such a way that loose boxes

would not be permitted on the top layer of the pallets.  Although Mr. Flores did not remember

this particular load and could not identify Mr. Ortiz as the driver of the truck, he did

acknowledge that his signature on the paperwork indicated that he loaded Mr. Ortiz's truck.

8

**D.      Testimony of Inspector Richard Ramsey and Sergeant Scott Armstrong**

Inspector Richard Ramsey testified that he is employed by the Motor Transportation Division of New Mexico's Department of Public Safety.  As an employee of fifteen years, he has been inspecting commercial vehicles primarily at the Gallup, New Mexico Port of Entry. Sergeant Scott Armstrong testified that he has worked for the Department of Public Safety for fifteen years, the majority of which he has been stationed at the Gallup Port of Entry.  Among Sergeant Armstrong's duties is the inspection of commercial motor vehicles at the Port of Entry in an effort to interdict illegal drugs.

One of Inspector Ramsey's duties is to check the driver's logbook to make sure drivers do not provide false information or exceed their permissible driving time.  Inspector Ramsey explained that a logbook is a record in which commercial truck drivers are required to keep track of their trip, particularly their driving time, off-duty time, fueling time and sleeper time, as well as what cargo they are hauling and the total miles traveled.  Inspector Ramsey also inspects bills of lading and truck trailer registrations.

Inspector Ramsey testified that on June 18, 2008, at around 1:00 p.m. when he was working at the credential booth at the Gallup Port of Entry, Ortiz and Sons Trucking entered the port.  He explained that on this particular day, Mr. Ortiz's was one of a handful of trucks that randomly receive a red light, which requires that they enter the Port of Entry for inspection of documents and a safety check.

Defendant Felipe Canela was driving when the truck entered the Port of Entry and stopped at the credential booth.  Inspector Ramsey noticed that another individual, later identified as Mr. Ortiz, was sitting in the passenger seat.  As part of the safety check, Inspector

Ramsey first asked Mr. Canela for his logbook.  Mr. Canela handed Inspector Ramsey a

logbook, and Inspector Ramsey then directed Mr. Canela to drive the truck into the parking lot.

At that time, Inspector Ramsey entered the building located adjacent to the credential booth.

Shortly thereafter, Mr. Ortiz approached him and told him that the logbook that Mr. Canela had

handed him in fact belonged to Mr. Ortiz.  Inspector Ramsey observed that Mr. Ortiz nervously

walked back and forth and constantly looked around the lobby.

Inspector Ramsey then examined both drivers' logbooks and noticed some discrepancies

and violations.  For example, he noted that the drivers had failed to include the total number of

miles they had driven, and the logs did not contain any notations as to the shipper information or

commodity.  According to Inspector Ramsey, such violations constitute minor form and manner

violations and do not require the issuance of a citation.  Subsequently, Sergeant Armstrong

further conceded that logbook violations are very common.

Because Mr. Ortiz and Mr. Canela arrived at the Gallup Port of Entry on the eighteenth

of June, Inspector Ramsey's attention was particularly caught by information logged in Mr.

Canela's logbook regarding his status through the *nineteenth* of June.  According to Mr. Canela's

logbook, he started driving from Guadalupe at 2:00 a.m. on June 18th, went off duty for a short

time in Palm Springs, California, and then drove from there to Phoenix.  The logbook further

showed that in Phoenix, Mr. Canela went off duty at 1:00 p.m. on June 18th and remained off

duty through June 19th at 7:00 a.m.  This concerned Inspector Ramsey because in fact, Mr.

Canela had driven into the Port of Entry on the eighteenth.

Mr. Canela's logbook did not record any stop in Arizona for fueling, a fact that was

later confirmed through receipts.  Mr. Ortiz's logbook did not contain any information regarding

a co-driver and did not indicate when the load was put in the truck, both of which amounted to violations of state and federal regulations.

After noticing the various logbook discrepancies, Inspector Ramsey asked Sergeant Armstrong to run a check on Mr. Canela's driver's license, and the officers learned that Mr. Canela's license was invalid.  Sergeant Armstrong subsequently went to the lobby area and issued Mr. Canela a citation.  He confronted Mr. Ortiz about the logbooks and noticed that he appeared nervous – his voice was shaky and he was stuttering – but the sergeant did not otherwise notice anything out of the ordinary with respect to Mr. Ortiz's physical condition.

After comparing the two logbooks and learning that Mr. Canela's license was invalid, Inspector Ramsey and Sergeant Armstrong decided to conduct a further inspection of the truck. Since Mr. Ortiz was the owner of the truck, Mr. Canela's presence was not necessary and Sergeant Armstrong directed him to go back into the building.  Inspector Ramsey observed that Mr. Ortiz appeared calmer during the inspection than he had when he was inside the lobby.

After the inspection, Inspector Ramsey and Sergeant Armstrong proceeded to check the securement of the load.  As they went to the back of the trailer, Inspector Ramsey noticed that it was secured with a lock and a seal.  As the bill of lading did not list a seal, Sergeant Armstrong asked Mr. Ortiz about it.  Mr. Ortiz explained that he had an extra seal from a company with whom he worked locally in California, which he used to secure the doors.  During the ensuing conversation, Sergeant Armstrong noticed that Mr. Ortiz's voice was getting more shaky and he was stuttering more than he had when they were inside.

During the inspection, Sergeant Armstrong instructed Mr. Ortiz to open the padlock. Sergeant Armstrong testified that Mr. Ortiz's hand was shaking as he put the key into the lock.

11

After Mr. Ortiz opened the padlock, Sergeant Armstrong broke the seal.  He asked Mr. Ortiz to open the doors of the trailer, but Mr. Ortiz only opened them about one foot, which was insufficient to enable Sergeant Armstrong to do the inspection.  At the sergeant's request, Mr. Ortiz fully opened the doors.  Sergeant Armstrong then entered the back of the trailer and noticed that the nylon strap used to secure the left pallet was broken, and the pallet had begun shifting.  Sergeant Armstrong then asked Inspector Ramsey to retrieve a ladder for him so that he could crawl up on to the boxes without doing any damage to the produce.

While Inspector Ramsey was getting the ladder, Sergeant Armstrong engaged in further conversation with Mr. Ortiz.  Mr. Ortiz claimed that someone else had loaded the truck.  At this stage, Sergeant Armstrong observed that Mr. Ortiz's voice was shaky, he appeared nervous, and he did not make eye contact.  In light of his years of experience with other truck drivers, Sergeant Armstrong found this lack of eye contact unusual.

When Sergeant Armstrong crawled over the load lock and onto the boxes, he observed that the pallets were loose.  Inspector Ramsey and Sergeant Armstrong both testified that when Sergeant Armstrong noted this, Mr. Ortiz attempted to enter the trailer to fix it, but the officers instructed him not to do so.

During Sergeant Armstrong's inspection, he observed a red paper bag.  Mr. Ortiz claimed he was unaware of the bag's contents.  Sergeant Armstrong then determined the bag contained illegal narcotics and he placed Mr. Ortiz under arrest. At the time of his arrest, Mr. Ortiz looked toward the ground and shook his head, and he did not appear shocked.  Sergeant Armstrong instructed Inspector Ramsey to keep an eye on Mr. Ortiz at the rear of the trailer.

Sergeant Armstrong then went to arrest Mr. Canela.  Neither at the time of Mr. Canela's

arrest nor during any time while he was at the Port of Entry did Sergeant Armstrong observe any nervousness on the part of Mr. Canela.  During the arrest, Mr. Canela appeared surprised and stated that the trailer simply contained vegetables.  Sergeant Armstrong took Mr. Canela into the patrolman's office and handcuffed him to a chair.  He then placed Mr. Ortiz in a different room and also handcuffed him to a chair.  Sergeant Armstrong then continued to inspect the trailer and discovered a black duffle bag.  It was later determined that this bag also contained illegal narcotics.

Throughout the four hours that Mr. Canela and Mr. Ortiz remained at the Port, Sergeant Armstrong did not observe Mr. Ortiz to be in medical distress and Mr. Ortiz did not ask for any kind of medical assistance.  Sergeant Armstrong testified that nothing about Mr. Ortiz's physical appearance caused  him any concern about Mr. Ortiz's well-being.  Inspector Ramsey also stated that during the entire period following the truck's arrival at the Gallup Port of Entry, Mr. Ortiz did not appear to be ill, he did not request any medical assistance, and was fully awake during that time.  Inspector Ramsey did not notice anything out of the ordinary about Mr. Ortiz's physical condition.  Although Mr. Ortiz had appeared nervous while he was in the lobby earlier, he appeared calm when he was handcuffed to the chair.

### E.        Testimony of Janet Williams

Janet Williams, the manager of Cargo Data Corporation, a company that supplies temperature monitoring devices designed primarily for the produce industry, testified with regard to the temperature recorder utilized to monitor the temperature in Mr. Ortiz's trailer.  She testified that the device records the temperature at fifteen-minute intervals.  She also testified that the device in this case had been rigorously tested for accuracy both at the factory and at the

13

plant, prior to being sent to Apio.  With reference to a chart that had been generated in this case reflecting the interval temperatures, she noted that the temperature fluctuated quite a bit throughout the trip and that it remained mostly around forty degrees, rather than between thirty-four and thirty-five degrees as Apio required.  Ms. Williams testified that in her experience, this type of temperature fluctuation was normal.  She further testified that the temperature in the trailer had increased from 42.1 degrees to 49.9 degrees Fahrenheit between 7:59 a.m. and 8:14 a.m. on June 18th, and the highest recorded temperature of 50.9 degrees occurred at 8:29 a.m. (New Mexico time).  This increase of nearly eight degrees was significantly greater than any other increase during the trip from Guadalupe to Gallup.

### F.      Testimony of Mark Hyland

Finally, the government presented the testimony of Mark Hyland, a DEA special agent with over twenty years of service.  He testified that Phoenix was a source city for narcotics, meaning that significant quantities of narcotics enter the country through Phoenix, where they are prepared for transportation by commercial motor vehicle, rental car, and Greyhound bus. Agent Hyland has personally been involved in about three dozen narcotics cases at the Gallup Port of Entry since 2004.

In Agent Hyland's experience, those who package drugs and those who transport them are not usually the same person.  He testified that the packaging and wrapping around the cocaine found in Mr. Ortiz's truck were sent for fingerprint analysis to a laboratory, and the prints found did not match the fingerprints of either Mr. Ortiz or Mr. Canela.  Agent Hyland testified that the quantities found in the truck were consistent with wholesale distribution quantities.

On cross examination, Agent Hyland stated that neither defendant was carrying large quantities of cash.  He testified that it is standard procedure to investigate whether a possible drug transporter is in possession of large quantities of cash, because many couriers are paid up-front to deliver narcotics.  He also stated that agents investigating drug trafficking suspects usually look for signs of nervousness.  According to Agent Hyland, none of the reports documenting the investigation in the instant case – which he had recently reviewed in preparation for trial – indicated that Mr. Canela was nervous.

At the close of the government's case in chief, Defendants moved for judgment of acquittal pursuant to Rule 29.  Mr. Ortiz argued that no evidence had been presented to the jury showing that he knew that drugs were concealed in the trailer.  Mr. Canela maintained that he did not own the truck and the evidence in no way showed that he was involved in or knew about the drugs in the trailer.  He emphasized that there was no indication that he was nervous, he had no significant amount of money on his person, and there was no evidence indicating he was inside the Apio facility when the truck was loaded.  When arrested, his only response was a statement to the effect that there were vegetables in the truck.  Defense counsel further emphasized that the logbook violations were not serious enough to merit a citation.

With respect to Mr. Ortiz, the government responded that the evidence showed that Mr. Ortiz put the seals on the load, signed for the load and put the load locks on.  He also had a nervous demeanor when he came into the Port of Entry.  The record demonstrated that the drivers spent nineteen hours in Phoenix, a source city for drug trafficking, even though they were operating under time constraints.  The government argued that these facts lead to the proper inference that Mr. Ortiz waited in Arizona for an anticipated delivery of narcotics.

15

With respect to Mr. Canela, the government pointed out that while Mr. Ortiz was the owner of the truck, Mr. Canela had responsibilities as a driver and that by driving he facilitated the distribution of the drugs.  The government asserted that this was not a situation in which Mr. Canela was merely present.  Furthermore, the government maintained that Mr. Canela, along with Mr. Ortiz had false logbooks, and specifically tried to avoid providing his logbook in an attempt to avoid detection by law enforcement officers at the Port of Entry.  The Court reserved ruling on Defendants' motions and took the matter under advisement.

## II.    Evidence Presented by Defendant Felipe Canela

Mr. Canela presented the testimony of his wife, Myra Canela.  She stated that Mr. Canela was employed as a truck driver.  Ms. Canela stated that it was common for her husband to be asked to do a trucking job with little to no notice, so he usually kept a change of clothes and toothbrush handy.  On June 16, 2008 Mr. Canela received a phone call, after which Ms. Canela drove him to Mr. Ortiz's house in Fontana, California to prepare for a trucking trip.

On cross examination, Ms. Canela described the couple's financial struggles.  She noted that their car had been repossessed and that Mr. Canela had child support obligations for four children from a prior relationship.  She further testified that in June of 2008, Mr. Canela was behind on his child support payments and she had to lend him $100 to help him with the payment.  Mr. Canela was also primarily responsible for the maintenance of the house which he had owned for over twenty years.

Defendant Felipe Canela then testified.  He testified that he had been a truck driver for nearly twenty years.  After a few jobs working for trucking companies, Mr. Canela purchased his own flatbed truck and became an independent truck driver.  In April of 2008, the Department of

16

Motor Vehicles refused to reinstate his driver's license because he had fallen behind on child support payments. Although he sent a payment of $1600, including $100 he borrowed from his wife, his license still had not been reinstated at the time he was driving Mr. Ortiz's tractor trailer in June of 2008.

Mr. Canela confirmed his wife's testimony that on June 16, 2008 he received a call from Mr. Ortiz and then went to Mr. Ortiz's home in Fontana. Thereafter, he and Mr. Ortiz left in Mr. Ortiz's truck for the Apio facility in Guadalupe. At about 7:30 or 8:00 p.m., while Mr. Ortiz coordinated the loading of the truck, Mr. Canela went to sleep in the sleeper berth.

The next thing that Mr. Canela remembered was being knocked out of the bed at around 2:00 a.m. on June 17th. Mr. Canela testified that as Mr. Ortiz was getting on the freeway a few miles from the Apio facility, he ran over the shoulder. Mr. Canela moved from the sleeper berth to the passenger seat and noticed that Mr. Ortiz was fighting to stay awake. At Mr. Canela's request, Mr. Ortiz pulled over so that Mr. Canela could take over driving.

Mr. Canela followed Mr. Ortiz's instructions to take Interstate 10 eastbound. After instructing Mr. Canela, Mr. Ortiz fell asleep almost immediately. When they arrived in Palm Springs, Mr. Canela stopped at the Pilot truck stop to go to the bathroom, and then resumed driving. Around 9:00 or 9:15 a.m., Mr. Ortiz woke up and asked Mr. Canela to stop in Ehrenberg, Arizona, where they bought gas and ate breakfast. From Ehrenberg, Mr. Canela drove to Phoenix in about two hours. They arrived in Phoenix at around 1:00 p.m, where the temperature was 126 degrees.

Mr. Canela marked Palm Springs on his logbook as off duty at 7:00 a.m. He explained that even though he and Mr. Ortiz spent only five minutes in Palm Springs, his logbook indicated

he was there for an hour because he had forgotten to record a stop in Ehrenberg, where they fueled and ate breakfast for an hour.  It was not until he was in Phoenix that he realized he made a mistake in logging this stop as Palm Springs rather than Ehrenberg.  He did not want to correct the mistake, because a log book costs five dollars and he only had two dollars on him, and he did not want to borrow money.[2]

Upon their arrival in Phoenix, Mr. Canela had been driving ten hours, just one hour under the regulatory limit of eleven consecutive hours.  Mr. Canela stopped at a Flying J truck stop in Phoenix, where he and Mr. Ortiz spent eighteen to twenty hours.  As explanation for this prolonged stop, Mr. Canela stated first that he was "out of hours," and on cross examination he further indicated that Mr. Ortiz appeared too tired to drive.  He also stated that he wanted to watch Game Six of the NBA finals between the Boston Celtics and the Los Angeles Lakers.  Mr. Canela provided some context to describe the significance of this game, noting that he was a former professional boxer and an avid sports fan in general, and these two teams had not faced each other in the finals since the late 1980s.

As Mr. Canela and Mr. Ortiz had arrived in Phoenix at 1:00, and the basketball game did not start until 5:00, Mr. Canela and Mr. Ortiz watched two movies in the truck.  Shortly after 5:00 p.m., Mr. Canela and Mr. Ortiz entered the driver's lounge of the truck stop, anticipating a large crowd would convene to watch the basketball game.  Mr. Canela positioned himself close to the television, but rather than joining him, Mr. Ortiz stood in the hallway.  The seats near the

---

[2]According to Mr. Canela, the drivers agreed that Mr. Ortiz would pay for all of their meals, and this was factored into their agreement as to how much Mr. Canela would receive for his help as a co-driver.  Therefore, Mr. Canela relied on Mr. Ortiz and he did not need to carry cash for his meals.

television filled up.  At some point during the game, Mr. Canela went to the bathroom and

noticed Mr. Ortiz standing in the hallway watching the game.  The game ended around 9:00

p.m., when Mr. Canela noticed that Mr. Ortiz was no longer watching the game.  He testified that

he had not noticed when Mr. Ortiz left; he could have left during half-time but it might have

been later.  After the game, Mr. Canela looked for Mr. Ortiz and found him asleep in the bottom

bunk of the sleeper berth.  Mr. Canela then went to sleep in the top bunk.

Mr. Canela explained that because of the hot temperature in Phoenix, they left the truck

running during the entire time they were stopped so that they could leave the air conditioning on.

Mr. Ortiz was driving as he and Mr. Canela left Phoenix early in the morning on June 18th,

reaching Flagstaff at about 8:30 a.m. and continuing east on Interstate 40 to New Mexico.  As

soon as they got on I-40, Mr. Ortiz began shaking, which caused the truck to rock sideways.

About twenty or so miles west of the New Mexico border, Mr. Ortiz agreed to pull over so that

Mr. Canela could drive.  Mr. Ortiz went to sleep immediately and Mr. Canela continued driving

to the Gallup Port of Entry.

Mr. Canela testified that when they stopped at the Port of Entry, an officer asked him for

his logbook.  Mr. Canela provided Mr. Ortiz's logbook because he could not reach his own

logbook and the truck belonged to Mr. Ortiz.  At the officer's direction, Mr. Ortiz entered the

building and Mr. Canela stayed in the truck.  Soon after that, Mr. Ortiz returned and told Mr.

Canela that the officer wanted to talk to him.  Mr. Canela testified that he quickly grabbed his

logbook to update it, but forgot that he had already noted that he was off duty the day before.

Accordingly, in an effort to update the book to accurately reflect the previous day's duty status,

he mistakenly began filling out information for the nineteenth.  Mr. Canela stated that he was not

attempting to hide anything; he had plenty of available hours, but he simply made a mistake as to the correct date.

Noticing the logbook discrepancies, Officer Ramsey questioned Mr. Canela and requested his driver's license.  After Officer Ramsey reviewed his license, Sergeant Armstrong entered the building and asked Mr. Canela to sit down.  While seated, Mr. Canela casually chit-chatted with another driver.  However, shortly thereafter Sergeant Armstrong informed him that he was under arrest.  Mr. Canela testified that he learned he was under arrest for transporting controlled substances, to which he replied, "Bullshit, we have a load of vegetables."  Partial Tr. of Proc., Test. of Felipe D. Canela at 38 [Doc. 154].  He stated he had no knowledge whatsoever of the drugs in the trailer.

On cross examination, the government questioned Mr. Canela about his failure to adequately maintain his logbook as well as the fact that he was driving on a suspended license.[3] He explained that when his license was suspended, he decided to stop driving his own truck for fear that it would be impounded if he were discovered.  Instead, he began looking for jobs as a co-driver, and intentionally did not disclose the fact that his license was suspended to other truck owners.  He believed that if he were caught driving someone else's truck without a license he would be cited, but the owner of the truck would not suffer any significant consequences.

When asked to explain the improperly recorded logbook, Mr. Canela's answers were consistent with those he provided on direct examination.  He testified that when they arrived in

---

[3]On cross examination, Mr. Canela corrected the government's use of the word "suspended" with respect to his license.  He stated that his license was not suspended, but rather it was "not reissued" because he was behind on child support payments.  As Mr. Canela never explained this distinction, the Court describes Mr. Canela's license as "suspended" to  minimize confusion.

Phoenix, he realized he made a mistake logging his off-duty time as Palm Springs instead of Ehrenberg, and quicky corrected it because he did not want to have to buy a new logbook.  He further testified that he had only two dollars for the entire trip because part of the drivers' agreement was that Mr. Ortiz would pay for all of Mr. Canela's meals.

Mr. Canela also testified on cross examination as to his relationship with Mr. Ortiz.  He stated that they had met roughly eight years prior, but did not see each other for the bulk of those eight years.  They re-met in 2007 and had done a few trucking jobs together.  Mr. Canela stated that he had never seen Mr. Ortiz shake as badly as he shook after they drove through Flagstaff.  Although he had seen him shake a little bit, he thought this was simply Mr. Ortiz's way of fighting to stay awake.  Mr. Canela was unaware that Mr. Ortiz suffered from a medical condition.

Also on cross examination, the government asked Mr. Canela about whether or not he had any tendency toward nervousness.  First the government covered the ground of Mr. Canela's financial problems at the time of his trip with Mr. Ortiz.  Mr. Canela stated that he preferred to handle financial matters himself rather than involving his wife, describing her as a "nervous wreck" with respect to finances.  Partial Tr. of Proc., Test. of Felipe D. Canela at 77 [Doc. 154].  The government then asked Mr. Canela: "But not you? . . .  You don't get nervous, right?"  *Id.* Without giving him a chance to respond, the government began asking about his prior career as a professional boxer, in an apparent attempt to demonstrate that a person who for years regularly engaged in "stare downs" before boxing matches has honed his ability to act tough.  Eventually, the defense objected on relevance grounds, and the Court sustained the objection.

III.    **Evidence Presented by Defendant Manuel Ortiz**

Mr. Ortiz's wife, Bertha Ortiz, testified that she and Mr. Ortiz had been married for twenty-seven years. She stated that he suffered from diabetes and that in June of 2008, he was trying to control it through his diet. She testified that on June 15, 2008, Mr. Ortiz looked a little ill and he looked even worse the next day. Still, Mr. Ortiz began the trip with Mr. Canela on June 16th.

Following Ms. Ortiz's testimony, the defense presented the testimony of private investigator Gary Aisnworth. Mr. Ainsworth testified that he visited the Apio facility for about two to three hours on two separate dates in April, and on both dates he drove onto the facility without being stopped by a security guard. He observed the loading of several trucks, and stated that many drivers did not watch the loading process. Mr. Ainsworth testified that he was never approached by a security guard while he was at the facility.

On cross examination, Mr. Ainsworth stated that the sealed loading area at Apio was secure, and he could not enter that area. Moreover, he did not enter the facility through the truck entrance, which requires trucks to pass through a security booth. He also observed a combination lock on the doors separating the public area of Apio where the truckers would initially walk in, from the secure area.

Following Mr. Ainsworth's testimony, Susan Rueler, a registered nurse and cardiovascular specialist, testified on behalf of Mr. Ortiz. Based on her review of Mr. Ortiz's reports, she opined that his blood sugar level of 340 was representative of diabetes. She testified that based on the information in the reports, Mr. Ortiz was hyperglycemic, meaning his blood sugar was elevated. Ms. Rueler stated that sweating and shaking are normal symptoms of a

22

hyperglycemic person.  On cross examination by Mr. Canela's counsel, she stated that with a blood sugar level of 340, diabetes is not controllable by diet alone.

On cross examination by the government, Ms. Rueler testified that she could not diagnose Mr. Ortiz as diabetic based on written reports alone.  However, she stated that one of the reports she had reviewed indicated to her that a practitioner had diagnosed him as diabetic. She also testified that she had reviewed three readings of Mr. Ortiz's blood sugar levels, one of which was taken on January 24, 2009 and recorded a level of 116, which is in the normal range for non-diabetics.  She further acknowledged that the reading of 340 was taken on December 20, 2008 and the third reading was undated.  She also testified that it is likely that the symptoms would get worse during a period of several hours if a person is not treated and remains sitting.

Mr. Ortiz then called Roger Allen, a transportation consultant who assists trucking companies in complying with federal and state regulations.  Mr. Allen also is a litigation expert who is hired to investigate accidents and testify as to who he believes was at fault.  Mr. Allen testified that there was nothing unusual about the route that Mr. Ortiz and Mr. Canela took through Phoenix, Arizona.  He estimated that the increase in milage from driving through Phoenix, Arizona rather than Needles, California was roughly forty-seven miles, which was insignificant for a cross-country trip.  He stated that it is common in the trucking industry for a driver to have a preferred route based on considerations such as fuel prices or construction delays, even if that route is slightly longer.  He further provided on cross examination that common internet mapping services such as Mapquest do not provide the most efficient route for truckers, and when he mapped the trip in question on a service called "PC Milemaker," that service recommended the same route that Mr. Ortiz and Mr. Canela took.  On cross-examination,

Mr. Allen stuck to his position that the additional mileage did not significantly affect the drivers' overall profit, but he conceded that the fact that the drivers ran the truck for the entire time they were in Phoenix could significantly reduce their profit.

Mr. Allen further testified that it is not uncommon in the trucking industry for warehouses to prohibit truckers to monitor the loading of their trucks, out of concerns for liability in case a non-employee is injured during the loading process.  With respect to logbooks, Mr. Allen testified that generally the only truckers who fully comply with regulations pertaining to logbooks are those who work for large nationwide trucking companies.  He estimated that seventy percent of truckers do not keep accurate logbooks as required by law.

Mr. Allen further testified as to regulations pertaining to ill or fatigued drivers, and stated that it was not unusual for an ill or fatigued driver to take a sixteen- to eighteen-hour break.  He also estimated that if Mr. Ortiz and Mr. Canela left Phoenix before 7:00 a.m. on June 18th they would have made it in time to New Jersey by June 20th by 6:00 p.m.

Mr Allen testified that he is familiar with the problem of loads of cargo shifting during transit.  He stated that even when a load is properly secured, it can shift during transit.  He further testified, while viewing a photograph of the inside of Mr. Ortiz's trailer taken after it entered the Gallup Port of Entry, that the manner in which the trailer was loaded would have made it easily possible that the owner of the truck would not have noticed something concealed within one of the pallets.

Finally, Mr. Allen testified that it is common for truck drivers to carry their own seals and locks so they can choose to secure their trailers even if the company for which they are hauling does not require them to do so.  He concluded that there was nothing unusual about Mr.

Ortiz placing his own seal and lock on his trailer.  However, on cross examination, Mr. Allen

revealed Mr. Ortiz's statement that he placed the seal on the truck on Ehrenberg, Arizona.  Mr.

Allen conceded that this was unusual, as a trucker would normally place the seals on the truck as

soon as the truck was loaded.  According to Mr. Allen, this reduces the likelihood that the

trucker will be blamed if any cargo is missing; rather, such an error would be more easily

attributable to the facility where the truck was loaded.  However, on re-direct examination, Mr.

Allen contradicted himself and said that there was nothing unusual about the fact that Mr. Ortiz

placed the seal on the truck in Ehrenberg because different drivers have different procedures.

On cross examination, the government asked Mr. Allen whether someone with a

diagnosis of diabetes would be permitted to have a commercial driver's license.  He replied that

such a question was not within his immediate expertise, but stated that he believed that someone

who is able to control their diabetes may hold a driver's license that would have to be renewed

on an annual basis.

Finally, the government asked Mr. Allen to describe his role as an expert witness in a

previous case out of the Southern District of Texas.  In this case, Mr. Allen had testified on

behalf of the defendant, William Ener.  The government asked Mr. Allen if he was aware that

following his testimony at trial, Mr. Ener had been acquitted and then arrested for drug

trafficking a few weeks later.  Counsel for both defendants immediately objected, and the Court

sustained their objections.

After the close of evidence, outside the jury's presence, the Court reprimanded the

Assistant United States Attorney for asking this question of Mr. Allen.  Defense counsel for Mr.

Canela moved for a mistrial, whereas defense counsel for Mr. Ortiz requested a limiting

instruction.  The Court declined to grant a mistrial, and issued an instruction to the jury not to consider the testimony regarding Mr. Ener.

At the close of all the evidence, counsel for Mr. Canela renewed his motion for a judgment of acquittal.  He argued that the government's case was extremely weak and that no reasonable jury could find Mr. Canela guilty under the facts presented.  The government argued that the evidence showed that for over nineteen hours Mr. Canela and Mr. Ortiz remained in Arizona in very high temperatures.  The data recorder indicated a significant spike in the temperature of the trailer while Mr. Ortiz and Mr. Canela were stopped in Arizona.  Moreover, the seal and padlock were placed on the truck in Arizona rather than California.  The government argued that this evidence strongly supported its theory that the drugs were placed in the trailer in Phoenix.  The government further argued that Mr. Canela facilitated the distribution of drugs in the trailer because he was driving, and Mr. Ortiz was responsible as the owner of the truck who exercised control over the trailer.

## ANALYSIS

## I.      Sufficiency of the Evidence with Respect to Felipe Canela

"Where possession is not clear, such as when the contraband may be attributed to more than one individual, constructive possession requires some nexus, link, or other connection between the defendant and the contraband."  *United States v. Reece*, 86 F.3d 994, 996 (10th Cir. 1996) (citation omitted).  As the government argued with respect to Mr. Canela's Motion for Judgment of Acquittal, the strongest evidence it had linking Mr. Canela to the narcotics was the fact that he was present in the truck and thereby facilitated the distribution of drugs.  Mr. Canela's mere presence fails to establish a nexus, link, or other connection between Mr. Canela

and the narcotics found in the tractor trailer.  *See United States v. Castorena-Jaime*, 285 F.3d

916, 933 (10th Cir. 2002) (citation omitted) (defendant's "mere presence" in vehicle with

narcotics insufficient to prove required nexus).

In any given case, the question of whether or not the government has presented sufficient

evidence for a reasonable jury to find a defendant guilty is inherently a fact-specific inquiry.

However, this Court has reviewed ample case law in which appellate courts have examined

whether or not such a verdict can be sustained based on evidence similar to that which the

government presented in this case.  In numerous cases whose facts are similar to the instant case,

appellate courts have found that the government failed to provide sufficient evidence to sustain

the conviction of an individual who was present in or near a vehicle with a co-defendant when

illegal narcotics were found.  *See United States v. Moreno-Hinojosa*, 804 F.2d 845, 847 (5th Cir.

1986) (evidence insufficient to support conviction when defendant knew co-driver, rode on a trip

he may have known was improper, and misrepresented his job situation and relationship with co-

driver after arrest); *United States v. Pace*, 922 F.2d 451, 452-53 (8th Cir. 1990) (evidence

insufficient to support conviction where defendant drove co-defendant's car that contained

almost 200 pounds of cocaine for an extended period of time, cocaine was in closed containers in

area of car not visible to defendant, and defendant appeared nervous and fidgety to officer who

pulled him over); *United States v. Gonzales*, 993 F.2d 1543 (5th Cir. 1993) (unpublished)

(evidence insufficient to sustain guilty verdict when defendant was present at the scene where

drugs were found hidden in truck and briefly held box containing cocaine); *see also United*

*States v. Diaz-Carreon*, 915 F.2d 951, 954 (5th Cir. 1990) (noting that although "[k]nowledge of

the presence of a controlled substance often may be inferred from the exercise of control over a

vehicle in which the illegal substance is concealed[,] . . . evidence that [the defendant] was the driver of the [vehicle is] . . . insufficient *in itself* to support a finding of guilty knowledge.") (emphasis in original); *United States v. Garza*, 990 F.2d 171, 174 (5th Cir. 1993) ("[B]ecause the drugs were hidden [*i.e.* concealed in burlap sacks stacked in and behind boxes of produce in tractor trailer], the government was required to show more than control of the vehicle.").

Moreover, in cases with comparable facts to this case, courts have sustained guilty verdicts only when they are based on stronger evidence than the government presented against Mr. Canela.  In *United States v. Gwathney*, 465 F.3d 1133, 1143 (10th Cir. 2006), the Tenth Circuit sustained a jury's guilty verdict where the defendant was the sole driver of a tractor trailer in which marijuana was found, he signed the bill of lading after the trailer was loaded, and the evidence showed that someone could have placed the marijuana in the trailer after it had been loaded and while it was under the defendant's control.  The court stated that it was reasonable for the jury to conclude based on this evidence that the person who loaded the marijuana into the trailer "might well have been [the defendant], the operator and custodian of the vehicle and the load, or someone acting at his behest or with his knowledge."  *Id*.  In *United States v. Ortiz-Ortiz*, 57 F.3d 892, 895 (10th Cir. 1995), the court found that a passenger's mere presence in a car containing marijuana was insufficient to sustain a conviction, but held that presence in combination with other evidence the government presented was in fact sufficient to sustain a guilty verdict: the passenger claimed that two "good Samaritans" had offered the use of their car without any arrangements for the vehicle's return; the passenger and his driver co-defendant gave conflicting stories as to whether or not they knew the owner of the car; and the entire car smelled strongly of the perfume used to conceal the marijuana's odor.  In *United States v.*

*Gonzalez-Lira*, 936 F.2d 184, 192-93 (5th Cir. 1991), the Fifth Circuit sustained a conviction where the defendant owned and drove a truck whose trailer contained marijuana, he had keys to the trailer, his story regarding his trip contained inconsistencies, and he claimed not to have noticed the flaws in the bill of lading despite his extensive experience as a truck driver.  In all of these cases in which appellate courts sustained jury convictions, the courts cited the ample evidence against the defendant from which a jury could reasonably conclude that he was guilty. In the instant case, the government did not provide comparable evidence.

The government presented no evidence showing that Mr. Canela witnessed the loading process.  The government introduced no physical evidence of Mr. Canela's signature or any other form of his approval of the contents in the truck.  None of the evidence the government presented demonstrated that Mr. Canela had possession or maintained control over the area of the trailer in which the drugs were found.  Had the drugs been found in the sleeper berth or the cab, the jury could have reasonably inferred that Mr. Canela was at least aware of their presence. However, the government presented no evidence allowing a reasonable inference that Mr. Canela played any role in loading the truck, securing the seal or padlock, or otherwise monitoring the contents of the trailer.  He did not possess the key to the padlock, and had not himself secured the seal.  The fingerprints found on the packaging of the drugs did not match Mr. Canela's.

Above all, Mr. Canela's behavior when confronted by officers at the Port of Entry simply was not that of an individual who knowingly possessed illegal narcotics.  When Sergeant Armstrong and Inspector Ramsey began their inspection, Mr. Canela did not seem at all nervous. When he was arrested, he exclaimed that the only thing in the trailer was vegetables.  On cross

29

examination, the government asked Mr. Canela about his propensity toward nervousness in a seeming attempt to convey to the jury that Mr. Canela would never act nervously even if he was aware that he was carrying contraband. However, the Assistant United States Attorney continued cross examination without giving Mr. Canela the opportunity to respond to the question. No reasonable jury could have concluded based on this brief exchange that Mr. Canela acted calmly notwithstanding his knowledge of the presence of narcotics in the trailer. Such a conclusion would have amounted to "piling inference on inference." *See Jones*, 44 F.3d at 865.

The government also presented evidence that Mr. Canela's license was invalid and his logbooks were improperly recorded. The evidence showed that Mr. Canela recorded a stop in Palm Springs as having occurred in Ehrenberg, and he recorded the dates incorrectly such that the dates recorded in his logbook were one day ahead of the actual date. Viewing this evidence in the light most favorable to the prosecution, the government has proven at best that Mr. Canela maintained a sloppy logbook. The jury could not reasonably have concluded that Mr. Canela's failure to record the proper date indicated that he was attempting to hide something from the inspecting officers. Although he improperly logged a stop in Ehrenberg as a stop in Palm Springs, this "raise[s] a mere suspicion of guilt" at best. *See Troutman*, 814 F.2d at 1455. In light of witness testimony that such logbook errors are common, this is insufficient – even under the restrictive standard of review this Court must exercise – to allow a reasonable trier of fact to conclude that Mr. Canela had any knowledge of the narcotics in the truck's trailer. The facts that Mr. Canela was driving on an invalid license and was behind in child support payments bear no relation to the issue of whether or not he knowingly transported illegal narcotics. "A verdict that is, in fact, based upon a guess or a mere possibility cannot be upheld." *Reece*, 86 F.3d at 997.

**II.**     **Sufficiency of Evidence with Respect to Manuel Ortiz**

    **A.**     **Substantive Convictions for Possession with Intent to Distribute and Aiding and Abetting**

Although the Court may have a reasonable doubt as to Mr. Ortiz's guilt, it must view the evidence in the light most favorable to the government and it must draw all reasonable inferences in the government's favor.  *United States v. Wardell*, 581 F.3d 1272, 1280 (10th Cir. 2009) (citation omitted).  While engaging in its analysis, the Court must be mindful of the fact that a criminal conviction may stand even if it rests on circumstantial evidence alone.  *United States v. Hooks*, 780 F.2d 1526, 1530-31 (10th Cir. 1986).

In contrast to Mr. Canela, Mr. Ortiz owned the truck and trailer and therefore had greater knowledge and control of the vehicle and its contents.  Moreover, he was present during the loading process and he signed a document indicating he was aware of the truck's contents.  He secured the seal and padlock on the trailer, properly giving rise to an inference that he exercised control over the trailer's contents.

Taken as a whole, the witnesses' testimony gives rise to the reasonable conclusion that no one at the Apio facility played any role in placing the narcotics in the trailer.  While it is true that Mr. Larose's generalized testimony with respect to the prohibition of strangers in the facility was undermined by Mr. Ainsworth's testimony that he drove onto the Apio grounds and remained there without being approached by a security guard, the witnesses' testimony was consistent with respect to the implementation of strict security measures in close proximity to the fresh produce.  Although Mr. Ainsworth entered and remained in the public areas of the facility, he was not permitted to enter the secure areas where the produce was processed, palletized, and loaded.  It was therefore reasonable for the jury to conclude that no prohibited person snuck into

the secure area and placed the drugs on Mr. Ortiz's truck.  Pedro Flores's testimony confirming

Apio's strict loading procedures provides further support for the jury's conclusion that Mr. Ortiz

monitored the loading of his truck and would have noticed if someone placed a black duffel bag

and shiny red paper bag in the trailer.

The jury could reasonably have concluded based on the evidence the government

presented that once Mr. Ortiz's truck was loaded at the Apio facility, he maintained exclusive

control over it.  Mr. Ortiz himself placed the seal and lock on the trailer – even though this was

not required by the shipper or the receiver of the produce – and he possessed the key to the

padlock.  As only he held this key, it was reasonable for the jury to conclude he had exclusive

access to the trailer, and he must have been aware of or participated in the loading of the

narcotics into the trailer.  *See Gonzalez-Lira*, 936 F.2d at 192-93 (upholding conviction where

defendant owned truck and trailer where narcotics were found and possessed trailer's keys).

Moreover, Sergeant Armstrong and Inspector Ramsey testified as to Mr. Ortiz's physical

state and both officers believed he appeared nervous during critical points of the inspection of

his documents and his trailer.  The officers testified that Mr. Ortiz did not appear ill or ask for

any medical assistance.[4]  Even if the jury believed that Mr. Ortiz was diabetic, it would still be

reasonable for them to conclude that his nervous behavior was indicative of guilty knowledge

rather than a medical condition, particularly in light of Inspector Ramsey's testimony that Mr.

---

[4]Although the Court must consider only the evidence presented by the government, the Court notes that even if it were to consider Susan Rueler's testimony, it would still conclude that the jury was entitled to discredit Mr. Ortiz's theory that his nervousness was due to diabetes. The officers' testimony that he did not appear sick or indicate that he was sick undermines his theory that he was suffering from a diabetic episode that made him sweat and shake uncontrollably.

Ortiz appeared calmer at certain points during the inspection.

Mr. Ortiz was nervous while he spoke to the officers inside the Port of Entry and continued to act nervously when he unlocked the trailer doors.  He was reluctant to open the trailer.  When the officer began his inspection, Mr. Ortiz attempted to jump into the trailer and fix the unbalanced load himself.  In contrast to Mr. Canela, when Mr. Ortiz was informed that the officers had discovered narcotics in his trailer, he put his head down and did not appear surprised.  This behavior, in combination with his exclusive dominion over the trailer, could reasonably indicate his guilty knowledge and his attempt to conceal evidence that he was carrying illegal narcotics.  *See United States v. Diaz-Carreon*, 915 F.2d 951, 954 (5th Cir. 1990) ("Nervous behavior at an inspection station [when supported by other evidence of guilt] frequently constitutes persuasive evidence of guilty knowledge.") (citations omitted); *see also Garza*, 990 F.2d at 174-75 (sustaining guilty verdict when government presented evidence that defendant was nervous during inspection of trailer over which he exercised sole ownership and control).

### B.      Conspiracy Conviction

Finding it was reasonable for the jury to conclude that Mr. Ortiz exercised control over the trailer, the Court also finds that the jury could have reasonably accepted the government's theory that someone loaded the narcotics onto the truck at some point while Defendants were in Arizona.  In addition to hearing Janet Williams' testimony regarding the temperature spike the morning of June 17, 2008, the jury considered Defendants' unusually long stop in Phoenix.  It was reasonable for the jury to infer that the drugs were loaded in Arizona, and that Mr. Ortiz was aware of their loading because he exercised control over the truck.  The jury reasonably could

have concluded that unknown persons in Arizona facilitated the loading of the narcotics.

The government need not have proven that Mr. Canela participated in the conspiracy in order to sustain Mr. Ortiz's conviction; the government need only have proven that Mr. Ortiz conspired with at least one other person. *See United States v. Wardell*, 581 F.3d 1272, 1280 (10th Cir. 2009) (identifying elements of conspiracy, including "an agreement with *another person* to violate the law" but not requiring the co-conspirator be a co-defendant) (emphasis added). However, the Court's analysis does not stop here. Although the jury reasonably could have concluded that another person was involved in the loading of the drugs into the trailer, it is not enough that the activities of multiple people "occasionally or sporadically place them in contact with each other. . . . What is needed is proof that they intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *Caldwell*, 2009 WL 5103110, at *4 (italics in original) (quotation omitted). The government must establish proof beyond "casual transactions between the defendant and the conspirators." *Id*. at *6 (quoting *United States v. Ivy*, 83 F.3d 1266, 1285 (10th Cir. 1996)).

Even assuming the jury's verdict was based on a reasonable inference that Mr. Ortiz retrieved the narcotics from someone in Arizona, the government presented no evidence whatsoever that Mr. Ortiz's involvement with these unidentified individuals was anything beyond a casual transaction. The government relied exclusively on the relationship and alleged agreement between the two defendants as basis for its conspiracy charges. As the Court has found that the government did not produce sufficient evidence showing that Mr. Canela participated in any unlawful agreement, Mr. Ortiz's conspiracy conviction cannot be sustained on the evidence presented. *See Evans*, 970 F.3d at 668 ("To prove conspiracy, the government

must show [] that *two or more persons* agreed to violate the law. . . .") (quotation omitted).

While the jury might have suspected that Mr. Ortiz participated in a complex plan to meet other

conspirators at a specific time and location in Arizona for purposes of loading illegal narcotics

onto his trailer, such a suspicion amounts to "speculation and conjecture [] render[ing] its finding

a guess or mere possibility." *See Sunward Corp. v. Dun & Bradstreet, Inc*., 811 F.2d 511, 521

(10th Cir. 1987) (quotation omitted).

  Examining the evidence in the light most favorable to the government and drawing all

reasonable inferences in favor of the jury's verdict, the Court finds that the government did not

sustain its burden of proof with respect to Mr. Ortiz's conspiracy conviction.  However, the

evidence was sufficient to establish Mr. Ortiz's knowledge of the presence of the narcotics

beyond a reasonable doubt.  While the jury could have concluded that unknown individuals

loaded the narcotics at Apio and coordinated their arrival at their intended destination absent

either defendant's knowledge, such a conclusion was not required.  *See United States v.*

*Gwanthney*, 465 F.3d 1133, 1143 (10th Cir. 2006) (noting that jury may, but is not required to,

draw inference about defendant's knowledge of presence of narcotics).  And while the Court

may have entertained a reasonable doubt as to Mr. Ortiz's guilt, it may not sit as a second jury in

the case and analyze whether or not it finds the government to have proven its case beyond a

reasonable doubt.  *Jackson*, 443 U.S. at 319.  With appropriate deference to the jury's verdict,

the Court is compelled to conclude that the evidence is sufficient to sustain its verdict of guilt

with respect to Mr. Ortiz's possession with intent to distribute cocaine and ecstacy.

## CONCLUSION

After careful analysis of the evidence, and viewing such evidence in the light most favorable to the government, the Court finds with respect to all three counts of the Indictment that the government failed to prove Mr. Canela's guilt beyond a reasonable doubt.  The Court further finds that the government likewise failed to prove Mr. Ortiz's guilt with respect to Count 1 of the Indictment, as the government failed to present any evidence showing that Mr. Ortiz acted together with another individual for their shared mutual benefit within the scope of the conspiracy charged.  *See Caldwell*, 2009 WL 5103110, at *4.  However, a rational trier of fact could have concluded, based on the evidence the government presented, that Mr. Ortiz was guilty beyond a reasonable doubt of Counts 2 and 3 of the Indictment.

**IT IS THEREFORE ORDERED** that Defendant Felipe Canela's Motion for Judgment of Acquittal [Doc. 125] is **GRANTED**.  **IT IS FURTHER ORDERED** that Defendant Manuel Ortiz's Motion for Judgment of Acquittal [Doc. 132] is **GRANTED** with respect to Count 1 of the Indictment and **DENIED** with respect to Counts 2 and 3.

Dated: this 11th day of January, 2010.

_____
MARTHA VAZQUEZ
CHIEF U.S. DISTRICT COURT JUDGE